[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 24-10396

Non-Argument Calendar

_____

KIRILL VESSELOV,
MIKHAIL VESSELOV,
HAVEN HEALTH MANAGEMENT, LLC,

                              Plaintiffs-Appellants,

*versus*

LAIRD HARRISON,
MEDSCAPE LLC,

                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:23-cv-80791-DMM

_____

Before ROSENBAUM, JILL PRYOR, and BRANCH, Circuit Judges.

PER CURIAM:

Kirill Vesselov, Mikhail Vesselov, and Haven Health Management, LLC (collectively, Plaintiffs), appeal the district court's order dismissing their defamation action under Florida law against Laird Harrison and Medscape LLC. Plaintiffs claimed that Harrison and Medscape defamed them in an article reporting on a judicial proceeding in which Plaintiffs were named as defendants. The district court granted Defendants' motion to dismiss the complaint for failure to state a claim under Federal Rule of Procedure 12(b)(6), concluding that Florida's fair-report privilege for news reports of official proceedings protected the article. After careful review, we affirm.

## I.

On May 16, 2022, on its medical information and news website, www.medscape.com, Medscape published an article that journalist Harrison wrote (the "Article"). The Article summarizes the allegations and outcome of a lawsuit that Gilead Sciences, a pharmaceutical company, filed against about 58 named defendants, including Plaintiffs, based on an alleged scheme to defraud Gilead's low-income medication-assistance program.

The Article starts by summarizing the allegations and out-come of the lawsuit.  It begins,

> HIV drugs sold on the black market.  Clinics profiting from a charity program.  Shady pharmacy owners purchasing mansions and jets.
>
> Such are the accusations Gilead lodged against 58 defendants in a lawsuit alleging they profited ille-gally from AIDS prevention drugs that it supplies free to people who can't afford them.
>
> "Together, the Kingpin Defendants defrauded Gilead's Charitable program of more than $68 million in less than 2 years through a fraudulent mass enroll-ment scheme," wrote Gilead attorneys in a slide presentation submitted to the US District Court for the Southern District of Florida.
>
> Gilead settled with some of the key defendants in April for an undisclosed amount.  But the attorney for one group insists that her clients have been falsely accused and settled only because the court did not al-low them to present their case before freezing their assets.

The Article then goes into greater detail about the medica-tion assistance program, which provides pre-exposure prophylaxis ("PrEP") drugs to reduce the risk of infection from HIV, and about the nature of the alleged scheme.  "In the scheme alleged by Gil-ead," the Article states, "the defendants sent vans to neighborhoods

in Miami where they could find indigent people, many of them homeless, and offer them cash or cash cards for modest amounts if they signed up for [Gilead's program]." According to the Article, the defendants "allegedly provided false paperwork" to register the patients. The Article also cites a court declaration from Donna Quan, Gilead's senior director of data forensics, who, the Article says, alleged that the defendants "repurchased unused PrEP drugs from patients for $10, then resold them on the black market." The Article notes that Gilead alleged that "the defendants purchased real estate, cryptocurrency, jewelry, sports cars, and private jets and gambled" with their "ill-gotten gains."

The next section of the Article concerns the defendants' reaction to the settlement, and it identifies two groups of defendants in the Gilead lawsuit. With respect to Plaintiffs, it simply states, "An attorney for two of the alleged kingpins in this scheme, Kirill and Mikhail Vesselov, declined to comment." The Article continues, "But Robyn Lynn Sztyndor, who represents Michael Bogdan, Twiggi Batista, and a pharmacy and laboratory associated with them, denied Gilead's accusations." Then, the Article includes several comments from Sztyndor, who accused Gilead of "trying to avoid giving its drugs away to people who can't afford the retail price" by suing clinics and pharmacies with a high volume of patients in the program, and of being "wildly talented at making up a lot of allegations that just have no factual support." The Article further notes that Sztyndor, who she said believed in the program, denied wrongdoing by her clients and claimed that the whistleblowers had "later recanted their accusations or disappeared," and

that, "in a deposition, Quan"—the Gilead director quoted earlier—"admitted she didn't have specific evidence to inculpate Sztyndor's clients."

The Article concludes with comments from a third-party: "Whether Gilead's specific allegations are true, the system for providing PrEP drugs to people without insurance is vulnerable to fraud, said Barbara Kubilus, assistant director of the Behavioral Science Research Corporation, which provides staff to the Miami-Dade HIV/AIDS Partnership." The Article includes several quotations from Kubilus, including that a pharmacy "could make a bundle" if it could get reimbursed for PrEP drugs without actually dispensing them, and that it was common for patients to sell PrEP drugs due to their scarcity in certain areas.

Before publishing the Article, Harrison, its writer, conducted an investigation into the claims by Gilead. He reviewed the pleadings, transcripts of testimony, and other documents on the record. He also contacted attorneys for both Gilead and Plaintiffs. But Harrison spoke to only an attorney that had represented Plaintiffs for a brief period, and he failed to reach out to Plaintiffs' lead counsel in the Gilead matter, as instructed by the attorney he contacted, before finalizing the Article.

Plaintiffs Kirill Vesselov, Mikhail Vesselov, and Haven Health sued Harrison and Medscape for defamation in Florida state court, and the action was removed to federal district court under diversity jurisdiction. *See* 28 U.S.C. § 1332. The gist of the lawsuit was that the Article falsely implied Plaintiffs were guilty of Gilead's

accusations by failing to state that they denied the allegations or to note that the allegations were never proven and settled without admission of liability.

The district court dismissed Plaintiffs' amended complaint for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), concluding that the Article was privileged under Florida law because it was a "reasonably accurate recounting of Gilead's proceedings against the defendants." The court also dismissed Harrison as a defendant for Plaintiffs' failure to comply with a presuit notice provision. Plaintiffs appeal.

## II.

We review *de novo* a dismissal for failure to state a claim under Rule 12(b)(6). *Gov't Emps. Ins. Co. v. Glassco Inc.*, 85 F.4th 1136, 1140 (11th Cir. 2023). We also review *de novo* a district court's interpretation and application of state law. *Id.* "In this diversity case, we must apply Florida law and decide issues of state law the way it appears the state's highest court would." *Id.* (quotation marks omitted).

Florida recognizes a qualified privilege "to make reports of judicial and quasi-judicial proceedings as long as they are accurate, fair and impartial." *Huszar v. Gross*, 468 So. 2d 512, 516 (Fla. Dist. Ct. App. 1985). "The privilege extends to the publication of the contents of official documents, as long as the account is reasonably accurate and fair." *Alan v. Palm Beach Newspapers, Inc.*, 973 So. 2d 1177, 1180 (Fla. Dist. Ct. App. 2008).

To fall within this "fair report privilege," a news report must convey to its audience a "substantially correct account" of the documents or proceedings being reported on. *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. Dist. Ct. App. 1993); *Carson v. News-Journal Corp.*, 790 So. 2d 1120, 1121 (Fla. Dist. Ct. App. 2001) ("The fair reports privilege requires that, in order to be privileged, a news report of a public document must contain the substance of the subject the document undertakes to present, or any separable part thereof."). Thus, a report may be covered by the privilege even if it omits details or is not as precise as technical or scientific reporting. *Woodard*, 616 So. 2d at 502–03. In order words, the press may exercise "editorial discretion in what to publish." *Turner v. Wells*, 879 F.3d 1254, 1270 (11th Cir. 2018). Still, the press "will nevertheless be liable if the private plaintiff shows that the press failed to take reasonable measures to [e]nsure that the report of the proceeding is accurate." *Ortega v. Post-Newsweek Stations, Fla., Inc.*, 510 So. 2d 972, 975 (Fla. Dist. Ct. App. 1987).

"After the facts and circumstances of a communication are revealed, the issue of whether a privilege has been established is a question of law for the court to decide." *Tucker v. Resha*, 634 So. 2d 756, 758 (Fla. Dist. Ct. App. 1994). Thus, the court may decide as a matter of law whether, based on a given set of facts, the "allegedly defamatory statements are fair, accurate and impartial." *Alan*, 973 So. 2d at 1180; *see Turner*, 879 F.3d at 1262–63 ("[W]hether a statement of fact is susceptible to defamatory interpretation [is a] question[] of law for the court.").

8                    Opinion of the Court                    24-10396

Plaintiffs contend that the Article falls outside the fair-report privilege. The central defect of the Article, in Plaintiffs' view, is that it fails to mention that Plaintiffs had denied the allegations, in sharp contrast to the other defendants mentioned, whose denials are featured. The Article also falsely claims that their attorney declined to comment, Plaintiffs assert, and it omits the fact that Plaintiffs settled without any admission of liability. Thus, in Plaintiffs' view, the "Article as a whole gives the overall false impression that [they] did not deny the allegations and were guilty of them even though [they] did vehemently deny the allegations."

Here, Plaintiffs have not shown that the district court erred in granting Defendants' motion to dismiss. For starters, Florida's fair report privilege broadly covers the Article's retelling of Gilead's allegations and claims against Plaintiffs. "It is not [defamatory] to restate prior accusations when winding up a news story," *Brake & Alignment Supply Corp. v. Post-Newsweek Stations of Fla., Inc.*, 472 So. 2d 517, 518 (Fla. Dist. Ct. App. 1985), even if "[s]ome of the published information may have been phrased to catch [Medscape's] readership's attention," *Alan*, 973 So. 2d at 1180. The Article provided a substantially correct account of the allegations in the *Gilead* case, and of a notable recent occurrence in that case, namely, that Gilead had "settled with some of the key defendants in April for an undisclosed amount," including Plaintiffs. It never stated that those allegations were true or had been admitted by Plaintiffs. So "[w]hile some of the statements in the [Article] may be viewed as painting [Plaintiffs] in a negative light, this alone does not rise to actionable defamation." *Alan*, 973 So. 2d at 1180.

Nor are we persuaded that the Article falsely implied a defamatory representation through omission of certain facts. *See, e.g.*, *Hallmark Builders, Inc. v. Gaylord Broadcasting Co.*, 733 F.2d 1461, 1463 (11th Cir. 1984) (noting that Florida law recognizes that a defamation action can arise from "either false statements or statements with false implications"). The Article was not required to provide a comprehensive history of the Gilead litigation. The focus of the Article was on the settlement of accusations made by Gilead in the lawsuit, and reactions to it by those involved, not on the procedural history of the case, the defendants' litigation positions, or the specific terms of the settlement. *See Carson*, 790 So. 2d at 1122 (reasoning that the omission of facts relating to matters not "the focus of the [press] reports" was privileged and not actionable). Plaintiffs cite no Florida authority for the proposition that reports on judicial proceedings "must invariably include whether defendants have denied the allegations against them," as they claim.

And the Article otherwise reasonably conveys that Gilead's allegations were disputed and subject to doubt. In particular, it quotes an attorney for some of Plaintiffs' codefendants, Sztyndor, who asserted that Gilead was using "aggressive litigation" as a tactic to threaten clinics and pharmacies to "avoid giving its drugs away to people who can't afford the retail price." Szytndor also stated that whistleblowers who had come forward "later recanted their accusation or disappeared," and that Gilead was "making up a lot of allegations that just have no factual support." In short, the Article did not depict an unfairly one-sided view of the proceeding in Gilead's favor.

We also reject Plaintiffs' argument that the Article falsely implied a defamatory representation through "strategic juxtaposition" of facts concerning the other group of defendants Szytndor represented. *See Johnston v. Borders*, 36 F.4th 1254, 1275 (11th Cir. 2022) ("Even if the words are not literally false, they may still be defamatory if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts."). The contrast the Article sets up between the two named groups of defendants is not between admission and denial of Gilead's allegations. Rather, the Article simply states that Plaintiffs' counsel declined to comment, while Szytndor offered a vehement denial. Plaintiffs maintain that this representation was false because Harrison failed to follow up with their lead counsel in the *Gilead* case before publishing the Article.[1]

---

[1] Plaintiffs also contend that this allegedly false representation "occurred outside and after the conclusion of a 'public official proceeding,' precluding the application of the fair report privilege." But the fact that a reporter gathers information about an official proceeding second-hand does not defeat application of the privilege. *See Ortega v. Post-Newsweek Stations, Fla., Inc.*, 510 So.2d 972, 973, 976 (Fla. Dist. Ct. App. 1987) (holding that the privilege applied where the reporter gathered information about an official proceeding from public records, a law enforcement agent, and a real estate analyst). And Plaintiffs appear to rely on this representation only as support for their view that the Article as a whole implies a false view of their position in the *Gilead* case, not as an actionable misrepresentation on its own. Indeed, they assert that we "should consider the entire Article *as a whole* when evaluating its defamatory nature and the applicability of the fair report privilege." Plaintiffs' Br. at 20 (emphasis added). Because the Article as a whole plainly was reporting on the *Gilead* case, Plaintiffs have not shown that application of the fair-report privilege is precluded here.

But even so, we fail to see how the statement that Plaintiffs' counsel declined to comment, even when viewed against Szytndor's strong denials, reasonably implies that Plaintiffs did not deny the allegations or were guilty of them. It's unreasonable to suppose that readers would interpret declining to comment as tantamount to admitting liability, even without an express denial from Plaintiffs elsewhere in the Article.

Finally, Plaintiffs object to the Article's presentation of "extrajudicial expert assertions" made by Kubilus, an assistant director of an organization working with the Miami-Dade HIV/AIDS Partnership. But Kubilus did not express any opinion "[w]hether Gilead's specific allegations are true," or about Plaintiffs. Instead, she simply observed that Gilead's medication-assistance program was "vulnerable to fraud." Kubilus's comments cannot reasonably be construed as implying that Plaintiffs either did not deny or were guilty of Gilead's allegations.

## III.

For these reasons, the district court did not err in granting Defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6) based on Florida's fair-report privilege. Because we conclude that dismissal of the complaint was proper on that ground, we need not consider whether Plaintiffs complied with presuit notice requirements as to Harrison.

**AFFIRMED.**